1  BARBARA I. JOHNSTON, ESQ.
   8309 Shad Bush Avenue
2  Las Vegas, NV 89140
   (702) 684-6163; Fax: 541-6743
3  Barbara.johnston@rocketmail.com
   *Attorneys for Plaintiff*
4

5                    **DISTRICT COURT**

6                 **CLARK COUNTY, NEVADA**

7  DAVID BRIGHAM YOUNG,

8  Plaintiff,                          CASE NO.:    2:12-CV-00091-RFB-GWF

9  vs.

10 MERCURY CASUALTY COMPANY,           **PLAINTIFF'S MOTION IN LIMINE #1:
                                        TO EXCLUDE MERCURY'S BIO-
11                                      MECHANICAL ENGINEER RAY
          Defendants.                   MERALA FROM TESTIFYING AT
12                                      TRIAL**

13         Plaintiff, David Brigham Young, by and through his counsel of record, Barbara I.

14 Johnston, Esq., hereby file their PLAINTIFF'S MOTION IN LIMINE #1: TO EXCLUDE

15 MERCURY'S BIOMECHANICAL ENGINEER RAY MERALA FROM TESTIFYING AT

16 TRIAL. The following MOTION is based on the Pleadings and Discovery on file in this case,

17 this memorandum of points and authorities herewith, Plaintiff's Declaration, including any

18 documents and/or exhibits attached thereto, and any oral argument this Court may entertain at

19 the time of hearing of this matter.

20

21         Dated this 8th day of October, 2015.

22

23                                    _____/BIJ/_____
                                      BARBARA I. JOHNSTON, ESQ.
24                                    8309 Shad Bush Avenue
                                      Las Vegas, NV 89140
25                                    (702) 684-6163; Fax: 541-6743
                                      Barbara.johnston@rocketmail.com
26                                    *Attorney for Plaintiff*

27

28

                                        -1-

I.

**MEMORANDUM OF POINTS AND AUTHROITIES**

**A. REQUESTED RELIEF:**

Plaintiff's Motion in Limine #1: to Exclude Mercury's Biomechanical Engineer Ray Merala (Merala) From Testifying at Trial, seeks an Order from the court to exclude Mercury's Biomechanical Engineer, Ray Merala, from testifying before the Jury in this matter, and to exclude his 2 Reports dated **December 5, 2008, (Ex. 1), and his Supplemental Report dated May 29, 2009, (Ex. 2). The Order should include any references to fault and/or comparative fault,** and including any references to said Reports at trial and before the time of trial, including during Jury Selection. Moreover, the issue of "fault" for the subject auto accident is *res judicata.* (See Ex. 5 for the Binding Arbitration Decision), and as such, the fault or apportionment of fault of the subject accident should also be excluded at the time of trial because Schork was found to be 66 2/3% at fault, which was established as a matter of law and is *res judicata* and the "rule of the case".

Additionally, at Mr. Merala's Deposition, he produced documents, Exhibits 1 through 11 as attached to his Deposition, (Ex. 3, (a)(b)(c)(d)(e)(f)(g)(h)(i)(j)(k), attached hereto). Merala's deposition was taken on **January 20, 2011,** and these exhibits were never produced in the Defendant's Expert Disclosure**. (See Ex. 4 Def.'s Expert Disclosure).**   In fact, Merala testified that exhibit 3(a), was just prepared the morning of the day of his deposition. Ex. 7, p: 9:7-21.  So, in addition to exclusion of the late-provided documents that he did not rely upon for his Reports, Plaintiff requests that said Order would require that defense counsel and any witnesses, **must not**, **directly or indirectly mention**, **refer to**, **interrogate concerning**, or **attempt to convey to the jury in any manner any of the items precluded by these motions in Limine without obtaining Court permission to do so.** Defendant, defense counsel, and

any witnesses should be instructed that Court permission may only be obtained **outside the presence and hearing of the jury**. Further Defendant, defense counsel, and any witnesses, should be instructed to strictly follow any Order entered by the Court in connection with this matter.

## B. STANDARD OF ADMISSIBILITY.

Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials. *Luce v United States,* 469 U.S. 38, 41 n. 4 (1984). Further, the admissibility of expert testimony is governed by Federal rule of Evidence 104, for the court to decide preliminary questions about whether a witness is qualified, a privilege exists, or evidence is admissible. F.R.E. 104(a). *Occidental Fire & Casualty of North Carolina v Intermatic Incorporated, et al,* 2:09-CV-JCM (VCF), 2, (US District Court, District of Nevada, August 14, 2013).

**1. Preliminary Questions for the Court to Consider are Expert's Qualifications.**

**F.R.E. 104. Preliminary Questions.**
**(a) *In General*. The Court must decide any preliminary question about whether a witness is qualified, a privilege exits, or evidence is admissible.**

In so deciding, the court is not bound by evidence rules, except those on privilege. *Id.* p. 2. In order to satisfy the burden of proof for Rule 104(a), a party must show that the requirements for admissibility are met by a preponderance of the evidence. *Bourjaily v United States*, 483 U.S. 171, 175 (1987).

"In Federal Courts, the admission of expert testimony is governed by FRE 702, as elucidated by the U.S. Supreme Court in *Daubert*". *Barabin v AstenJohnson, Inc.,* 700 F.3d 428, 431 (9th Cir. 2012). According to F.R.E. 702, the district judge is required to function as a "gatekeeper" with respect to screening of expert testimony. *Kumho Tire Co. v Carmichael,*

1 | 119 S.Ct. 1167, 1176 (1999).

2

3
> FRE 702. Testimony by Expert Witnesses.
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion otherwise if:

4
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

5
> (b) The testimony is based on sufficient facts or data;

6
> (c) The testimony is the product reliable principles and methods; and
> (d) The expert has reliably applied the principles and methods to the facts of the case.

7

8   Evidentiary rulings are reviewed for abuse of discretion; however, we review a district

9   court's interpretation of the Federal Rules of Evidence *de novo*. *United States v Ruena*, 659

10  F.3d 903, 908 (9th Cir. 2011).

11      The "deference to the trial court's decision" is the "hallmark" of abuse of discretion

12  review. F.R.E. 702 imposes a special obligation upon a trial court judge to ensure that any and

13  all scientific testimony…is not only relevant, but reliable. *Id.* As the "gate-keeper", the court

14  must make findings as to whether a witness is qualified to testify as an expert on a certain

15
subject, and such decision is reviewed for "clear error".

16

17      The party seeking to have the testimony admitted bears the burden of showing that the

18  expert's findings are based on sound science, and this will require some objective, independent

19  validation of the expert's methodology; the expert's bald assurance of validity is not enough.

20  *Daubert v Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-593, 125 L.Ed.2d 469. (1993).

21
**2. The Court Must Consider FRE 403 Balancing Test.**

22

23      The trial Court is vested with discretion to simplify issues and to exclude even relevant

24  evidence if its probative value is substantially outweighed by the danger that it will confuse issues

25  or mislead the jury.  Questions of probative value are left to the sound discretion of the Court and

26  will not be disturbed absent a showing of abuse of discretion. *Uniroyal Goodrich Tire v Mercer*, 890

27  P.2d 785, 788, (Nev. 1995).   In *Uniroyal*, the Nevada Supreme Court held that the trial court was

28  justified in excluding the witness, where the Judge in the case below, allowed *voir dire* of the expert,

and after consideration of all the facts, excluded the witness from testifying, and on appeal, the Supreme Court upheld the decision, as the trial court's decision was based on substantial evidence.

The primary purpose for a motion *in limine* is to prevent prejudice at trial, See Brodit v. Cambra, 250 F. 3d 985, 1005 (9th Cir. 2003). The Court has authority to issue a preliminary ruling on the admissibility of evidence, *See* F.R.E. 401, 402, 403, and NRS 47.080. The decision to do so is vested in the sound discretion of the Court. *See United States v. Kennedy,* 714 F. 2d 968, 975 (9th Cir. 1983). The Court's discretion will not be overturned absent a showing of clear abuse of discretion. *See Longnecker v. General Motors Corp.,* 594 F.2d 1283, 1286 (9th Cir. 1979).

Young argues that even if the expert may qualify to testify as an expert if the evidence is relevant, the F.R.E. 403 "balancing test", and NRS 48.035(2) may still result in **inadmissibility**, which states: "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury."

> F.R.E. 403.   **Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, Or Other Reasons.**
> The Court may exclude relevant evidence it is probative value is substantially outweighed by a danger of one or more of the following: **unfair prejudice**, **confusing the issues**, **misleading the jury**, undue delay, wasting time, or needlessly presenting cumulative evidence.

When the proffered testimony or evidence is offered by a party that is prejudicial or otherwise inadmissible, **the evidence is still subject to being excluded at trial**.  "It is clear that the trial judge's ruling was based on substantial evidence, did not in any way constitute an abuse of discretion, and should be upheld.  Uniroyal Goodrich Tire Co. v. Mercer, 111 Nev. 318, 322, 890 P. 2d 785, 789 (1995).

> **3. Then the Court Must Consider Whether the Expert's Opinions and Evidence Rest on Scientific Reliability and Relevence.**

1   The statute governing the admissibility of Expert Testimony in Nevada is:

2   NRS 50.275. Testimony by Experts: If scientific, technical or other specialized
3   knowledge will assist the trier of fact to understand the evidence or to determine a fact
    in issue, a witness qualified as an expert by special knowledge, skill and experience,
4   training or education may testify to matters within the scope off such knowledge.

5   The Nevada statute tracks with FRE 702. *Hallmark v Eldridge* 189 P3d 646, 650 (Nev.

6   2008). "While, Nevada has not adopted the US Supreme Court's interpretation of *Daubert v*

7
    *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-592 113 S. Ct. 2786, 125 L.Ed.2d 469.
8
9   (1993), the Nevada Supreme Court has held that the federal court decisions discussing it may

10  provide **persuasive authority in determining whether expert testimony should be admitted**

11  **in Nevada Courts**". *Hallmark,* @ 651, citing *Brown v Capanna*, 105 Nev. 665, 782 P.2d 1299

12  1303 (1989). **Admission or exclusion under *Daubert* rests on the scientific reliability and**

13
    **relevance of the expert testimony**. *Ellis v Costco Wholesale Corp.*  657 F.3d 970, 982 (9th
14
15  Cir. 2011). The expert's opinion must be deduced from a "scientific method" to be admissible.

16  *Id. 982.*

17  **C. STATEMENT OF FACTS:**

18  **1.   Statement of Facts Regarding the Subject MVA.**

19  On **April 13, 2006, David Young** (Young) was involved in a major **motor vehicle**

20  **accident** which occurred when Young was traveling Northbound on Eastern between Sunset and

21
    Russell.  The at fault driver, Christopher Schork, imprudently exited the driveway from the East
22
23  side of Eastern, traveling East to West, traversing three busy through-lanes of backed-up traffic

24  that was traveling North on Eastern, when at the same time and location, Young was traveling

25  Southbound in the open center lane, which allows turns into and from either direction, but which

26  leads into and begins the left turn lane at Russell. As Schork crossed the three lanes of traffic, he

27  approached the center turn lane, and he testified in his Deposition, that he looked North, (to his

28  right) which is the opposite direction from which Young was approaching, (see Ex. 8, Schork's

-6-

Deposition excerpts, 53:1-13", Schork testified: "I got further on, looked again to the North, which would have been the southbound traffic to see if there was-you know, there would be a reason why I couldn't make it into the –you –know, for there to have been a reason."

This statement, standing alone, makes it clear that Schork was looking to his right **while turning to his left,** rather than looking to his left, where Young's vehicle was clearly on-coming and present, and then Schork pulled directly into Young's vehicle.  This demonstrates the imprudence of crossing three lanes of traffic and then one more lane to get into the Southbound lane in heavy, 5 o'clock rush-hour traffic.  Finally, in Mr. Schork's deposition, he admitted that he was cited as the primary cause of the accident.  (Ex.8, Schork Deposition 45:13.)  Thereafter, Young veered into the oncoming traffic and hit Thomas Margarit head-on.

    **2.  Mercury's Handling Post-Accident.**

At the outset in 2006, Mercury took possession of Young's vehicle, and totaled it out.  (Ex. 14).  Initially, and until mid-2009, Mercury delayed and denied payment of Young's underinsured benefits in the amount of $250,000 based on the fact that Mercury disputed that all of Young's damages were not caused by the April 13, 2006 accident and that the alleged closed head injury and loss of consciousness suffered in the accident either did not exist or simply was not caused by the subject accident.  That was why Mercury hired an orthopedic surgeon, Dr. Richard Dix, in October 2007 to conduct an IME and a Record's Review of all of David's prior medical providers from 2002 forward, and asked him Dr. Dix to render an opinion whether the subject MVA caused Young's substantial orthopedic injuries, or whether it should have been apportioned between Young's prior motor vehicle accident of 2002.  Dr. Dix's physical examination and Report provided that **all of the orthopedic treatment**, a cervical fusion and a jaw displacement surgery, were **reasonably related and caused by the subject MVA4/13/06.**[1]

---

[1] Dr. Dix stated in his Report that he was not qualified to speak to the cognitive impairments.

Then in 2008 Mercury hired a UCLA neuropsychologist, Dr. Robert Asarnow, Ph.D., to conduct an examination and record's review to determine whether Young suffered a traumatic brain injury as a result of the subject MVA.  By 2008, Young's medical bills were in excess of $200,000, and he was treating for headaches and cognitive difficulties.  Not surprisingly, Dr. Asnarow found that Young did not suffer from a traumatic brain injury.

Late 2008, Mercury then hired a Biomechanical Engineer, Ray Merala of Talas Engineering, to investigate whether the subject MVA could have caused Young's closed head injury or not.  Merala's report dated December 5, 2008, stated that this accident could not have caused Young's closed head injury, in 2009.  After Mercury received Merala's 12/05/08 Report, Mercury became concerned that a biomechanical engineer may not be admissible in Nevada and in the same entry, articulated the need to then focus on comparative fault, LWARREN **12/10/08.**

**Report also establishes forces not sufficient to produce the closed head injury being claimed.  On the descending; in the venue, this report will not likely get into evidence.  Instead, the evidence would need to be put to the jury to what degree the Insured's actions contributed to the accident.   Question, can the PR be admitted in this venue? , .  (See Claims Diary Ex. 9, 000047 dated 12/10/08, LWarren.)**

Mercury then shifted their focus from "**injury causation**" to morph into a "**comparative fault argument**", largely fostered by Gordon Park, Esq., Mercury's  attorney, who informed Mercury that Young was likely 51% at fault or more.  Thereafter, between December 2008 and the January through June 26th, 2009, the Claims department put pressure on Jeffrey Lipp and probably, Gordon Park, to get their Biomechanical Engineer, Ray Merala, to say that Young was more than 50% at fault. (Ex. 9, MCF 00046, 000047, 000049, 00052-00054).

Mercury was now faced with Dr. Dix's Report where he attributed 100% of Young's orthopedic treatment to the subject MVA, and being concerned that the Biomechanical Engineering Report opinions may not get into evidence, Mercury claims department put a "full court press" on Merala to change his Report and Ex. 9 claims diary supports this contention.

In 2009, after Merala complied with his second Report, Ex. 2, Mercury felt it needed to

have a "legal determination" that Young was greater at fault, and so Mercury required that Young

file suit in State Court, State Court A-539366-C, for the exclusive purpose of attempting to

establish that, as a matter of law, David was 51% or greater at fault, and therefore, Mercury would

owed no UM benefits to their insured.  In the State case, Mercury then required that Young to

enter into a **Binding Arbitration Agreement**, where Mercury **selected** the Arbitrator, Martin

Kravitz, Esq., as the Arbitrator, who was then and is now, a well-known, **well-established**

**insurance defense attorney**, attempting to "stack the deck" against Young--all this in a first party

insured case.

Then Mercury finally deposed the police officer, Officer Cunningham on **09/08/10, Ex.**

**15(a)**.  Mercury then took Thomas Margarit's deposition on 07/29/10, Ex. 15(b) and Christopher

Schork's deposition 07/01/10. Ex. 15(c).  The significance of the time of these depositions is that

clearly, when Mr. Merala conducted his **12/05/08 and 05/29/09 Reports**, he simply did not have

the benefits of any first hand testimony from other drivers in the subject accident.

In spite of Mr. Kravitz' insurance defense orientation, he determined as a matter of law,

**Christopher Schork was 66 2/3% at fault and Young to be 33 1/3% at fault**.  (See Ex. 5, for

the Binding Arbitration Decision, dated **January 27, 2011**).  Therefore, this issue is *res judicata*, and

need not be re-litigated at trial, but is offered by way of explanation of the history and issues at

trial.  The problem Mercury has now is what facts can be established to demonstrate a "genuine

dispute", since their position of comparative fault fails and Dr. Dix supported causation of at least

$151,000.00 in medical Bills.

### 3.   Talas Engineering Was Hired To Determine Whether Young's Cognitive Impairments (CHI) Was Caused by the Subject MVA.

In the case at bar, in the fall of 2008, Mercury hired a **biomechanical engineer** from

Talas Engineering, located in Fresno, CA., Raymond Merala, MS, PE, who held himself out as a

Biomechanical Engineer. (See Ex. 6 for Merala's CV).   His assignment is detailed in his

**December 5, 2008** Report which was to conduct a Biomechanical Analysis of whether this impact or accident could have caused Young's cognitive deficiencies as a result of a closed head injury. Notably, at this time, it is well settled on the record that in April, 2006, Mercury had taken possession of the Young vehicle, (See Ex. 14), and disposed of it without providing the actual vehicle to be inspected by either, anyone by or on behalf of the Plaintiff, or any expert on behalf of the Defendants. (See Ex. 13 for Photos of Young's pick-up damage photos.)

a)  <u>Ray Merala's Dec. 5, 2008 Report:</u>

Mr. Merala's **December 5, 2008** Report, (Ex 1), the first paragraph sets forth details of the collision that occurred on **April 13, 2006**, as follows:

> December 5, 2008
> Dear Mr. Park:
>       This letter summarizes the results of investigation to date on the above referenced matter.  The referenced litigation arises from collisions that occurred on April 13, 2006, on S. Eastern avenue (sic), approximately 1000 feet south of Russell Road, in Las Vegas, Nevada. The right side, in the vicinity of the right front wheel, of a 2003 Ford F 150 pickup driven by Mr. David B. Young came into contact with the front a (sic) 2003 Honda Accord driven by Mr. Christopher Schork, and then the left front of Mr. Young's vehicle came into contact with the left side of a 1992 Ford F 250 pickup driven by Mr. Thomas Margarit.

Query, "what investigation"?  Since Merala was retained more than two years after the accident, none of the three vehicles were ever inspected by Merala.  Merala's report and even his Deposition testimony (taken **01/24/11**), make it very clear that he never came to Las Vegas, NV to view the accident site, (instead he went on Google Map to get a scene overview, which was dated three months before the subject accident and before it underwent substantial construction), he never determined where on Eastern the accident occurred, he never calculated where the respective vehicles' starting points, the angles at contact, and where they ended up after impact, making his report based on supposition, estimates and assumptions.  Clearly,  Merala never interviewed any party, and ultimately, he never gained **any** first hand witness information from any of the three parties to the accident **before** he completed his two reports,  **December 5, 2008**

1   **Report**. (Ex. 1) and May 29, 2009 Report, (Ex. 2).

2          Additionally, Merala was not even provided with photos of either Christopher Schork's

3   Honda Accord or Thomas Margarit's F 250 Ford pickup, at the time he prepared first two reports

4   (08 and 09). A review of the first report depicts the conspicuous absence of the Schork's and

5
    Margarit's photos and/or driver's statements, as listed in Merala's **documents he received from,**

6
    **presumably Mercury or Mercury's attorney, Gordon Park**. Not until at the time of Merala's

7
    Deposition, **January 20th, 2011**, did Merala even have a photo of the Honda when Merala was

8   deposed, and notably, his Deposition was taken five years after the subject accident and three

9   years after Merala prepared his two reports, **December, 2008 and June, 2009. This is smoke**

10
    **and mirrors for Mercury to make it appear that Merala relied on documents provided at**

11
    **his Deposition [(Ex. 3 (a-k)] in preparation of his two reports, which is totally inaccurate.**

12
           The list of "Materials Received and Reviewed" confirms what documents he received and

13
    reviewed in the preparation of his **12/05/08** Report as follows:

14

15
              * Traffic Collision Report;
16            * Damage Appraisal for Mr. Young's 2003 Ford F 150 XLT Pickup;
              * **Color copies of 21 photographs of damage to Mr. Young's pickup;**
17            * **Eight color copies of accident site photographs;**
              * Transcription of statement of David Young dated April 19, 2006;
18            * Deposition transcript of David Young, Volume 1, dated September 13, 2007;
              * Deposition Transcript of David Young, Volume 2, dated October 11, 2007;
19                   And,
              ***Medical Records from 40 medical providers**, (not listed here, but in Ex. 1 @ p. 2)
20            And,
              IME Report of Robert F. Asarnow, Ph.D, dated July 28, 2008;[2]
21            IME Records Review and Report of Richard M. Dix, M.D., dated December 1, 2007.[3]

22
           **b. Merala's "Supplemental 05/29/09 Report", Ex. 2.**

23
           As provided in the "Facts Section" @ p. 7 herein, on or before **May 29, 2009**, Mercury

24

25

26  _____

27  [2] This Report is by Dr. Robert Asarnow, PhD., UCLA, which is Mercury's Neuropsychological Expert who conducted
    an Examination of Young to determine, whether in his opinion, Mr. Young had suffered a closed head injury caused by
28  this subject motor vehicle accident, which caused Young cognitive deficiencies.
    [3] Dr. Richard Dix conducted an Orthopedic Evaluation of Young on or about October 23, 2007, and reviewed Young's
    prior orthopedic medical records, current orthopedic medical records, and prepared a report dated December 1, 2007.

put pressure on Jeffrey Lipp and/or Gordon Park, Esq., to get Merala to prepare a **new opinion**, not previously considered in the **12/05/08 Report**, Ex. 1, that David is greater than 50% at fault for the subject Accident. See Ex. 12.  It is clear from the Claim's diaries, that Mercury was concerned that the Biomechanical Engineering opinions as to medical causation was not going to be admissible at trial, (see Exs. 9 and 12), which required that Mercury now change their tact to get their expert to say that Young is more at fault for the subject MVA, and therefore foreclosed from any Under-insured benefits. The only thing that is clear is that Merala never examined the actual vehicles to be able to determine Delta V speeds, angles of contact, speed of or placement of the vehicles prior to contact, and as such, the authority in Nevada requires that such testimony lacks foundation, is not based on scientific data capable of replication, and does not assist the jury in determining a fact in issue.

### D. In the Absence of Viewing the Subject Vehicles, Merala is Foreclosed From Rendering Specific Opinions of Vehicle Speed, Angles and Delta V Calculations.

#### 1. Merala Report of 12/05/08:

Merala's Report #1 first listed the documents that he gathered and reviewed, and considered available geometric and inertial data for the incident vehicles, reviewed collision estimating and reference material associated with the subject structures of the subject F 150 pickup, and examined reported results of crash tests.  Then, Merala listed the "crash test results" which were six different studies provided in his resume.  The point here is that Merala **never actually examined any the subject vehicles** because it is undisputed and well-settled that Mercury disposed of the Young vehicle long before they retained Merala in 2008. Moreover, as stated *infra,* Merala never received damage photos of the Schork Honda or the Margarit's F 250 Ford Pickup truck **prior to conducting his December 5, 2008 "investigation" and** Report, as clearly illustrated in the Documents List and in Merala's Deposition testimony, *supra.*  Instead, the Schork and Margarit photos were provided to Merala **for the first time at or just before Ray**

1   **Merala's Deposition** taken on **01/20/11**. Attached to the Merala Deposition are photos of the

2   Schork Honda. [These are provided attached hereto as (Exhibit 3,(k) pp. 6-9), which are the

3   Schork's Honda damage photos.] Neither of Merala's reports indicate receipt of photos of either

4   Schork's vehicle or Margarit's vehicles prior to drafting his two reports.

5

6          Page 2 of the Merala **12/05/08** Report (Ex. 1), details Merala's objectives:

7          The sections of the letter that follow **list the materials** received from your office, <u>to</u>
           <u>**provide an overview of injury biomechanics**</u>, <u>**provide a description of the accident**</u>

8          and <u>**damage to Mr. Young's pickup, present my analysis of the accident**</u>, present a
           <u>**review of the medical records provided**</u>, <u>**provide analyses and discussion related to**</u>

9          <u>**the brain injury allegedly sustained in the collision, and present my conclusions to**</u>
           <u>**date.**</u>

10

11         This makes it abundantly clear that Merala, as a biomechanical engineer, was asked to

12  review 42 different medical providers' records, and then render an opinion as to **whether this**

13  **accident could have caused Mr. Young's purported closed head injury and cognitive**

14  **deficiencies**.  Further, objective evidence to support this conclusion is that Mercury provided Mr.

15  Merala with the following documents Dr. Asarnow's neuropsychological IME along with Dr.

16  Dix's IME.  Merala Report, Page 3 of Ex. 1, begins with:

17

18         **Biomechanics Overview**
           **Biomechanics** is the application and study of **physical laws and engineering**

19         **principles** to **biological systems with the purpose of understanding how motions**
           **and forces affect those systems.  In human injury, biomechanics, the forces and**

20         **motions requires to damage structures (cause injury) such as bony and joint tissues**
           **are examined.**  Injury biomechanics focuses on the cause or mechanism of injuries, as

21         opposed to the diagnosis or treatment of injuries.  Biomechanical engineers are generally
           considered with and analyze the mechanical factors leading up to injury.  In contrast,

22         medical practitioners, such as physicians, are generally involved with diagnosis, treatment
           and management after an injury has occurred.  An objective of a biomechanical analysis it

23         to use sound scientific and engineering principles coupled with experimental data to
           examine the cause of injuries.  Factors such as magnitude, duration and direction of

24         loading and motion of the human body are considered in biomechanical analyses before
           drawing causal links between certain events and injuries.

25         **An understanding of the mechanical factors associated with an event is generally**
           **necessary to fully understand whether an event is likely to be injurious.**

26

27         The foregoing makes it explicitly clear that Merala was hired to determine whether the

28  subject accident could have caused Young's complaints of a mild traumatic brain injury as a result

of the subject motor vehicle accident. The next part of the Merala Report dated 12/05/08, of page 3, is entitled: **"Description of the Accident and Review of Testimony."**

The first full paragraph, mid-page of p. 3 of Merala's Report, (Ex. 1) begins:

According to the **materials reviewed**, on or about April 13, 2006 at approximately 4:04 p.m., the right front wheel and right front door of a northbound 2003 Ford F 150 pickup driving by Mr. David B. Young came into contact with the right front of a 2003 Honda Accord driving by Mr. Christopher Schork. After this contact, the pickup traveled in a northwesterly direction and the left front of Mr. Young's pickup came into contact with the left side of southbound 1992 Ford F 250 pickup driving by Mr. Thomas Margarit. The collision occurred on S Eastern Avenue, approximately 1000 feet south of Russell Road, in Las Vegas, Nevada.

Both the list of documents reviewed, *infra*, and the "Description of the Accident and Review of Testimony" section make it clear that Merala never actually saw, physically viewed, or examined Young's vehicle or that of Schork or Margarit. The entirety of the Merala Report relies exclusively on medical records, photos, exemplars, and studies which demonstrate that his report lacks foundation and proven scientifically valid premises. He then stated that he relied on photos of an exemplar of a 2003 Ford F 150 XLT pickup, which was blue, [(See Ex. 10 for 7 exemplar vehicle photos, Bates # DEF 03438 through 03519, 83 pages of photos. As provide herein, only 7 "exemplar" photos are attached hereto as Ex. 10.]

As related to Young's vehicle, the list of documents on page 1 of the Merala Report show that Merala only reviewed the Damage Appraisal and 21 color copies of photos of Young's 2003 vehicle. Bottom line, he never inspected Young's vehicle when he prepared his Reports or any time after, or even before his deposition in 2001.

Curiously, Merala's Report listed only David Young's Recorded Statement, Young's two EUO's, which Merala referenced as "Depositions", **but had no other competent documents or depositions of "first hand statements" by either Schork or Margarit, the other two drivers.** Furthermore, major portions of Merala's opinion relied upon the hearsay of the Police Report. (See Merala Report, Ex. 1, p. 4, last full paragraph), which begins: **"The traffic collision report**

-14-

1  **indicated that the 2003 Honda Accord …the first contact noted that the damages**

2  **associated with under the ride (vehicle structures going under opposing vehicle**

3  **structures) occurred.**"  It is well settled that the traffic report and its contents are inadmissible at

4  the time of trial as it is hearsay. *See* also, *Frias v Valle,* 698 P.2d 875, 877 (1985). Therefore,

5

6  Merala's reliance on the LVMPD Police Report builds  "hearsay within hearsay" and as such, the

7  above-referenced statement, standing alone would generally be excluded pursuant to Federal Rule

8  of Evidence 803, and as such, the testimony would most likely be excluded from being heard by a

9  jury.  Ultimately, Officer Cunningham's Deposition was taken in 2010, but apparently never

10  provided to Merala.  Therefore, Merala's opinion in many respects is faulty and if he is allowed to

11  testify at trial, he should be restricted from testifying on his reliance on the traffic report.

12
      2.  **Merala Report #2 dated 05/29/09:**

13

14  Mercury then shifted the basis of their "genuine dispute" from "Biomechanics and **injury**

15  **causation**" to a "**comparative fault argument.**" Support for this contention is found in Mercury

16  Claims' Diary, Ex. 9, on 12/5/08, SMARR wrote: "**Jeff, you and I discussed case on**

17  **12/04…..(redaction)…Is the liability consensus that the insured is at least 51% at fault for**

18  **loss and therefore barred from recovery?"**

19
Then on December 18, 2008, after Mercury had received Merala's Biomechanical opinion

20  as to whether a Closed Head Injury could be caused by the Delta V impact speeds, SMARR in

21
claims then turns to pressure Jeff Lipp to contact Merala to "**obtain a more definitive liability**

22  **position from the reconstructionist".**  (Ex. 9, MCF 000048).

23

24  Then, an entry dated Feb. 4, 2009, SMARR wrote:

25  **We just received a bill from reconstructionist Talas Engineering for $11,585.45.**
**You are following up for clarification on the bill as the amount owed appears**
26  **excessive.  We don't even have a definitive liability position from the**
**reconstructionist.  Be sure we get this too (sooner vs later). (Ex. 9, MCF 000048-49).**
27

28  May 26, 2009, SMARR enters:

**I discussed case with Jeff Lipp last week. He has spoken to defense regarding a more definite opinion on Insured's liability. We await a written update from the reconstructionist and defense."**

These diary entries make the timeline very clear that pressure is put on Jeff Lipp and/or Gordon Park to get Merala to "clarify" something he never considered in his first report, that of comparative fault. So, then Merala, based on timing and appearance, Merala was ostensibly concerned that Mercury would not pay his bill, so he provided a 1 page "Supplemental Report".

This letter supplements my report of December 8, 2008, and clarifies a finding reported at that time......Had Mr. Young not been using the center left turn lane as through lane, this accident likely would not have occurred.  It is my opinion that Mr. Young is more than 50% responsible for this incident, and but for his actions, this accident would not have occurred. (Ex. 2)

How can this Supplemental Report "clarify" something that wasn't in the first report at all? And on what facts, exhibits, deposition testimony, or other "competent evidence" does Mr. Merala rely to come to this startling bare-bones conclusion?  The only explanation is that Mercury needed that opinion to support their continued delay and deny of underinsured benefits when they realized that the Biomechanical Engineering report may not be admitted into evidence in Nevada.

**E.  Merala Is Not Qualified To Testify; Both Reports Lack Foundation and Reliability; Therefore, Merala Cannot Assist The Jury to Understand A Fact In Issue.**

**FRE 702. Testimony by Expert Witnesses.**
A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the **expert's scientific, technical or other specialized knowledge will assist the trier of fact** to understand the evidence or to determine a fact in issue."
(b) the testimony is based on **sufficient facts or data;**
(c) **the testimony is the product of reliable principles and methods**, and
(d) the **expert has reliably applied the principles and methods** to the facts of the case. F.R.E.702.

The preliminary issue to be decided in the subject Motion In Limine #1 is whether Ray Merala, a Biomechanical Engineer, employed by California based, Talas Engineering, is **qualified** as a Biomechanical Engineer expert to testify at trial based on his investigation of the subject motor vehicle accident which occurred on **April 13, 2006.** After the court considers Merala's

**qualifications**, the court must then consider, a) whether Merala's testimony is based on scientific, technical or other specialized knowledge will **assist the Jury determine a fact in issue; b)** whether the expert **bases his opinion on sufficient facts or data**; and c), whether the testimony is the **product of reliable principles and methods,** and d), whether the expert **reasonably applied the principles to the facts of the case.**

> **1.   Ray Merala Cannot Be Qualified As An Expert in Biomechanical Engineering.**

The Plaintiff believes and argues that Expert Ray Merala, PE  may not qualify **a) as an expert in Biomechanical Engineering**, because he has **no training in biomechanical engineering**; b) his testimony is **not based on sufficient facts or data, because he lacks foundation for his opinions**; c) his testimony is not the product of **reliable principles and methods because biomechanics is not in his area of expertise, and he is not qualified to provide the nexus between calculating the Delta-V (speed at time of vehicle contact), and resultant personal injury;** and d) the expert has not reliably applied the principles and methods to the facts to this case, nor are his "crash test results" reliably based on competent scientific principles.  For the reasons in sections **a**, **b**, and **c** above, both of his Reports and testimony at trial should be excluded.

As to Merala's December 2008 Report, Merala's CV (Ex. 6, ), reveals that he has never even had a class in the biomechanical engineering field, he has no degrees in any medical field or discipline, and he has no training in the field of a biomechanical engineer, even though he conducted his review of the case as a "Biomechanical Engineer", as detailed in his initial Report. He cited to no reports in support of his speed calculations at the time of impact. "Expert testimony is reliable if it is 'based upon sufficient facts or data', and is 'the product of reliable principles and methods', and the 'methods reliably apply to the facts of the case'".  FRE 702.  In *Niemeyer v Ford Motor Co.* 2:09-cv-2091 JCM (PAL) in excluding the engineer from testifying on issue of the speed of the vehicle at time of impact, held:

-17-

1    Here Caruso is an engineer. **His knowledge is properly considered scientific**. His
     estimates, therefore, **should be supported by some objective basis**. (cites omitted here).
2    The *Daubert* factors for determining reliability are not particularly relevant to the
     determining reliability are not particularly relevant to determining the reliability of his
3    opinions because his opinions are based largely on his experience, training and education,
     and not on scientific experiments he has performed....**There is no such objective basis**
4    **to support Caruso's 11-12 mph estimate, study, experiment, authoritative text or**
     **other objective source supporting the 11-12 mph range, and thus, the Court finds it**
5    **unreliable**.

6
7    Mr. Merala's CV details Mr. Merala's education and positions held and that he is a

8    Merala is a Registered Professional Mechanical Engineer, CA, #M026171, and that he is a

9    Member of five different groups related to mechanical engineering. However, his CV provides

10   that none of his education or memberships have any tangential relationship to or training in

11   Biomechanical Engineering.   Further, at Merala's deposition taken on January 20, 2011, he was

12   asked at Ex. 7, p. 15:11-25, 16:1-21, if he had any training as a physician, or formal training in any

13   aspects of biomechanics, or did he even take a course in biomechanical engineering, and he

14
15   responded: "--I have not taken a course. I've been to some seminars over the years were we've

16   talked about issues and things like that."

17   Yet, he held himself out as a Biomechanical Engineer to Mercury when being hired as

18   detailed in his 12/05/08 Report, Ex. 1, at page 3,"**Biomechanics Overview**".  Further, pages six,

19
20   seven and eight of his Report, Ex. 1, Merala detailed his review of **40 of Young's medical**

21   **provider's records**, and Merala's biomechanical--medical and legal **conclusions of causation**.

22   2.   <u>**Does Merala Offer Competent Scientific or Technical Opinions to Assist the**</u>
         <u>**Jury Determine a Fact in Issue?**</u>
23
24   Once an expert may be qualified, the court must then consider whether the testimony will

25   "**assist**" the trier of fact to understand the evidence or to determine a fact in issue by providing

26   opinions on scientific, technical or other specialized knowledge". FRE 702. "To guard against the

27   risk that jurors will accept an expert's testimony simply because he or she is an expert, a district

28   court must ensure that all expert testimony is not only **relevant** but **reliable**." *Daubert v Merrell*

-18-

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113, S.Ct., 2786 (1993).

Merala' Report, Ex. 1, he states that the first collision **delta-V was likely 5 mph or less;** the second collision, Young's speed **was likely 12-15 mph, and that neither collision is likely to cause a significant brain injury to a driver of a Ford F 150 pickup**. Additionally, when considering the dynamics of the subject accident, Merala's calculations indicate the Young speeded up after the initial contact with Schorck—which defies logic. Then Merala concluded: **"these biomechanical findings are consistent with the findings report by Dr. Robert F. Asarnow." This is 1) a medical-legal conclusion he is not qualified to make, and 2) is an opinion that is not based on reliable, scientific or objective bases.**

Merala outlined his specialized professional competence in the field of biomechanics.

> **Specialized Professional Competence:**
> Motor vehicle, recreational equipment, and industrial equipment accident reconstruction. **Vehicle dynamics, occupant dynamics**. Mechanical system and component failure. **Human injury biomechanics. Static and dynamic test design,** digital data acquisition and analysis. **Design testing, failure analysis** of recreational, agricultural, forestry, industrial, and construction equipment. **Risk analysis Analysis and design of dynamic systems.** (Highlights added).

Merala's CV lists fifteen **Selected Publications and Presentations,** where at least nine of the articles purport to be on **biomechanics of injury**. Our research indicates that he did not author any of the listed articles and only one or two are on biomechanics. Therefore, his "Selected Publications and Presentations" is grossly misleading. Plaintiff believes that Merala does not assist the trier of fact with any competent, scientifically-derived opinions regarding "whether Young was injured in the April 13, 2006 motor vehicle accident" and/or whether Young was 51% at fault for the subject MVA.

### 3.  Are Merala's Findings Based on Sufficient Facts or Data?

Merala never inspected any of the three vehicles involved in this case. He neither interviewed any of the drivers, nor did he read any deposition accounts of Schork or Margarit before he prepared his two reports, because their depositions were not taken until 2010, and

Merala's two reports were 2008 and 2009.  He never went to the scene to try to reconstruct what happened and where.  He never did a co-efficient of friction test, but in his deposition, he said he just assumed a number for the co-efficient of friction.  (Ex. 7, p. 32: 6-22)

But significantly, Merala never evaluated the damage to the actual vehicles, so he never measured the "crush" factor to deduce the actual impact speed, or the angles that the vehicles came into contact, or the directions from which the vehicles were traveling from or to, rendering his "Impact Study Simulation Reports, (Ex. 3, f), and/or his Findings of Delta V on first and second impacts, [Ex. 3 (a)], (which were **late-provided Exhibits to his Deposition)**, all incompetent, assumption and speculation, and not based on sufficient facts or data.  Therefore Merala's calculations of accurate pre-accident speed, angles of vehicular contact, location on Eastern, and more specifically, his conclusions of Delta V values, are not based on a competent investigation, sufficient to testify at trial.

4. **Are Merala's Findings Based on Reliable Principles and Methods?**

"The test for **reliability** is flexible and depends on the discipline involved, but the process entails **a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue**."  *Kumho Tire Co. Ltd. v Carmichael*, 526 *U.S.* 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d  238 (1999).  The law grants a district court the same broad latitude when it decides *how* to determine **reliability** as it enjoys in respect to its ultimate "reliability determination".  *Id.*, at 142, 119 S.Ct.1167.  This court must then consider **reliability and relevance** for the two Merala Reports, Ex. 1 and Ex. 2.

Expert testimony is reliable if it is "based upon sufficient facts or data", "the product of reliable principles and methods," and the expert "applies the principles and methods reliably to the facts of the case."  F.R.E. 702.  In *Daubert, infra,* the United States Supreme Court set forth a non-exhaustive list of factors that may guide a court in assessing the reliability of offered testimony:
    (1) whether a scientific theory or technique can be and has been tested;
    (2) whether the theory or technique has been subjected to peer review and publication;
    (3) the known or potential rate of error and the existence and maintenance of standards

controlling the techniques operation; and

(4) whether the technique is general accepted. *Id. Daubert U.S.,* 509 *at 593-594.*

Plaintiff acknowledges that the *Daubert* factors may have little application to expert testimony based on personal knowledge or experience, such as a medical doctor, *Neimeyer v Ford Motor Co.* (D. Nev. 2012), 6, but those are not our facts. In the instant case, Merala is an engineer attempting to testify on **medical causation** issues. When determining whether the Court may allow a jury to hear Merala's conclusions, the court must find that Merala's conclusions are **reliable** and **relevant** and grounded in scientific methodology.

First, Merala's opinions are not based on an area within his expertise, biomechanical engineering, and/or medical degrees or training, so the relevance is his opinions are out of the realm of his expertise. Secondly, his auto reconstruction is not reliable because it lacks in foundation as it is well-settled and developed *infra,* that Merala never inspected any of the three vehicles involved in the subject motor vehicle accident or even relied on first hand reporting by any of the parties to the accident, and other facts as stated *infra.*

In determining Reliability, the court will consider the expert's reasoning or methodology underlying the testimony that is **scientifically valid**, the court then must consider: (1) whether a theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether it is generally accepted in the scientific community. *Wagner v Cnty. Of Maricopa,* 673 F.3d 977, 989-990 (9th Cir. 2012). In *Wagner,* the district court did not abuse its discretion by excluding portions of Dr. Esplin's expert testimony as the court found that the testimony was (1) unsupported by evidence; (2) wholly uncredible, (sic) (3) lacking in foundation; (4) more prejudicial than probative; and (5) going to puzzle the jury. *Id.* 989-990. Ultimately, the proffered testimony was also concluded to be speculative. In summary, the 9th Circuit upheld the exclusion concluding "given the foundation and methodological deficiencies, the district court acted within its discretion to exclude this testimony under FRE 702

-21-

1   and 703". As applied to the instant case, prior to the time Merala did his first report, **December**

2   **5, 2008**, he never inspected any of the three vehicles in the subject accident on **April 13, 2006**. He

3   never did a site or scene inspection, and he never had any first-hand statements from the other

4   two parties, Schork and Margarit, and Merala did not see photos of the other two vehicles until at

5   least two years later just before his Deposition was taken in 2011. Bottom line, Merala never

6   examined any of the three vehicles prior to preparing his 2 Reports.

7

8       **F.  In Nevada, an Expert May Be Excluded If He Cannot Assist the Jury in
         Understanding a Fact in Issue When He Has Not Inspected the Vehicles.**

9

10          "The Federal Rules of Evidence require a judge to undertake a preliminary assessment of

11  whether the reasoning or methodology underlying the testimony is scientifically valid and of

12  whether that reasoning or methodology properly can be applied to the facts in issue". The leading

13  case in Nevada is *Hallmark v Eldridge*, 189 P.3d 646, 651 (2008), and the brief facts are that on

14  April 4, 2002, an employee of Tradewinds Building and Development Company, backed a

15  company truck into the driver's side of Carrie Hallmark's vehicle. At the time of the accident,

16  Carrie was sitting in the driver's seat and wearing a safety belt. The impact rocked one side of the

17  Hallmark's vehicle approximately three feet off the ground. As a result of the collision, one of the

18  tires on Hallmark's vehicle exploded and the left side panel of the Hallmark's car was gouged and

19  scratched. In determining whether the auto reconstructionist should have testified at trial, the

20  Nevada Supreme Court considered:

21

22          To testify as an expert witness under NRS 50.275, the witness must satisfy the following
            three requirements: 1) he or she must be qualified in an area of "scientific, technical or
23          other specialized knowledge", (the **qualification requirement**); (2) his or her specialized
            knowledge must "**assist the trier of fact to understand the evidence or to determine a**
24          **fact in issue: (the assistance requirement)**: and (3) his or her testimony must be limited
            "to matters within the scope of his or her specialized knowledge", (**the limited scope**
25          **requirement).**

26

27      **1.  Is Merala Qualified?**

28      First, the Court must first determine whether he or she is qualified in an area of scientific,

technical or other specialized knowledge.  In determining whether a person is properly qualified, a district court should consider the following factors:

> (1) Formal schooling and academic degrees;
> (2) licensure; and
> (3) employment experience,
> (4) practical experience and specialized training.

In *Hallmark, infra, 654,* the District Court found that Dr. Bowles **qualified** as an expert as a biomechanical engineer, **because he held both an MD degree**, as well as **a BS degree in mechanical engineering**.  The Supreme Court affirmed that the district court did not abuse its discretion when it determined that Dr. Bowles qualified as an expert under NRS 50.275 because substantial evidence supported its findings.

**2.  Does the Testimony Assist the Trier of Fact To Understand a Fact in Issue?**

Next, the Nevada Supreme Court went on to analyze whether Dr. Bowles' biomechanical engineer testimony satisfied the "**assistance**" requirement of NRS 50.275.  An expert's testimony will assist the trier of fact only when it is relevant and the product of *reliable methodology*.  In determining whether an expert's opinion is based on reliable methodology, a district court should consider whether the opinion is:

> (1) within a recognized filed of expertise;
> (2) testable and has been tested;
> (3) published and subject to peer review;
> (4) generally accepted in the scientific community, and
> (5) based on more than particularized facts rather than assumption, conjecture, or generalization.

If the expert formed his or her opinion based on the results of a technique, experience or calculation, then a district Court should also consider whether:

> (1) the technique, experiment, or calculation was controlled by known standards;
> (2) the testing conditions were similar to the conditions at the time of the incident;
> (3) the technique, experiment, or calculation had a known error rate; and
> (4) it was developed by the proffered expert for the purposes of the present dispute.

In *Hallmark*, 654-655, the Supreme Court concluded that the District Court abused its

discretion when it allowed Dr. Bowles to testify because his biomechanical testimony did not **assist the jury in understanding the evidence or determining a fact in issue**. In sum, the Supreme Court concluded that Tradewinds **did not introduce any evidence that Dr. Bowles attempted to re-create the collision by performing an experiment, so we cannot address whether his opinion was the product of reliable methodology**. Nor was any evidence proffered showing that Dr. Bowles' opinion was formed by and controlled by known standards or had an error rate. Instead Dr. Bowles simply affirmed that his opinions were supported by a "reasonable degree of medical and biomechanical certainty." In short, the Court reasoned that Tradewinds offered **insufficient foundation** for this court to take "judicial notice" of scientific basis of Dr. Bowls' conclusions.

The Nevada Supreme Court went on to say that Federal district and appellate case law supports our conclusion **that the district court should have excluded Dr. Bowles' biomechanical testimony, which concluded that the forces involved in the accident could not have caused Hallmark's alleged lower back injury, because Tradewinds did not demonstrate that his opinion was the product of reliable methodology.**

In summary, the Nevada Supreme Court concluded that the district court abused its discretion when it allowed Dr. Bowles' testimony because his testimony did not satisfy the "assistance" requirement of NRS 50.275. The discussion in *Hallmark* considered that Dr. Bowles' opinion was based **more on supposition than science because he did not inspect the Hallmark's vehicle, he could not identify an area or angle of impact, and he did not know the speed of the vehicles at the time of the collection.** This scenario is almost identical to the facts in the instant case, except Merala's credentials lack the medical education component.

- Merala did not physically inspect the subject vehicles;
- he did not do a test of the co-efficient of friction on the Eastern Avenue surface, yet he **assumed** the coefficient of friction was .75 in the simulation, **Ex. 7, p. 32: 6-22**;
- he never examined any of the three vehicles in the subject MVA, yet he rendered an opinion about the speed and angles on impact of the vehicles;

- he rendered an opinion about the Delta-V for Young in the first and secondary collisions, which necessarily had to include the angle and vehicle speed of both the Schork and Margarit's vehicle;

- Merala testified about the angles of the vehicles on impact, but when questioned about that in his deposition, he testified as follows, Ex. 7, Merala Depo @ pp. 31-32:
  Q: You looked at the damage to the Young vehicle in toto, both from the first and second impacts?
  A: Looked at them both, yes.
  Q: Okay, all right.
  A: Looked at the damage to the Margarit vehicle, considered the damage to the Honda, considered the vehicle geometric and inertia parameters, considered Mr.—
  Q: I'm sorry, say that again, please.
  A: The geometric and inertia parameters.
  P. 32:
  Q: What does that mean, please?
  A: Considered Mr. Margarit's deposition testimony[4] that he was going 35 or 40 at the time of impact. (**Note, Merala did not have any depositions at the time of his two reports.**)
  Q: Okay.
  A: Performed simulations and came up with these numbers.
  Q: **Assuming** the point of impact as we've seen in Ex. 2, what other **assumptions** did you make in performing your **simulations** that came up with the 28.3?
  A: What other **assumptions** did I make?
  Q: Yeah.
  A: I **think** we probably had a road friction coefficient of .75 in the simulation. I have Mr.—in the simulation that we're looking at, I have Mr. Young going straight. I don't have a steering input from his vehicle at the time of impact.
  Q: I **suppose** the angle is an assumption, right, the angle of the Honda?
  A: I think that we tried different angles, and we kind of came up with this one. It seems like it works pretty well. **So I think it's an estimate.**

- Merala even drew diagrams inconsistent with the physical damages done to the Young and Schork vehicles, which was provided at his deposition on January 24, 2011, almost three years after his initial reports were prepared. [Ex. 3, (b)(d) and (e)]. The Schork vehicle damages are frontal and right sided, resulting in a right side of the Young truck to the right side of the Schork vehicle, yet the diagram Merala prepared show the impact to the Young vehicle exclusively on the right side only and no frontal damage, and the major damage to the Schork's vehicle was right front and right side in an nearly side-to-side collision, such that the drawing depict an incorrect vehicle contact angles. Ex. 3, (a)(b) (d) and (e).

- Merala testified that he had never taken a course in biomechanical engineering, but that he had been to a seminar which discussed the topic. (See Ex. 7, Depo testimony, p. 16: 6-14).

In summary, Merala cannot be allowed to testify at trial in this matter.

---

[4] Mr. Margarit's Deposition was taken in July, 2010, clearly well after Merala's two Reports.

    **3.  An Auto Reconstruction Expert Cannot Render An Opinion on Speed and Angles of Vehicles Based on Photographs and Police Officer's Drawings and Police Reports Only, Without Actually Inspecting the Vehicles.**

It is well-settled in Nevada that an expert cannot render an opinion on the speed and angle of the vehicles based on photographs and police officers' drawings.  In *Levine v Remolif*, 390 P.2d 718 (Nev. 1964), the Supreme Court held: "**[p]roof of negligence cannot be left to mere speculation and conjecture**."  The court considered the testimony of an alleged expert as to the speed of the vehicles involved in a collision at intersection "**was inadmissible where based on photographs which didn't disclose damages to the frames of the vehicles and on a diagram which was drawn by policy officer inexperienced and untrained, in reconstruction of automobile accidents and on some information furnished by another officer.**" *Id.* **p. 721.**

In excluding the expert's testimony from trial, the Court reasoned, "with respect to the speed of the Thunderbird, his (the expert's) testimony was based entirely upon those exhibits in evidence, **the photographs of the scene of the accident and of the vehicles after they had come to rest, and the diagram made by two police officers…which gave their version of the movements of the two vehicles prior to and after impact.**"  *Id at p.722.*

In *Choat v McDorman*, 468 P. 2d 354, 356 (1970), in a similar factual scenario, the Court held that an expert is not qualified to talk about speed **based on failure to examine the vehicles in question**.  "The fact that a witness may be qualified as an expert does not automatically qualify him to give an opinion necessarily based on facts beyond his knowledge even though opinion may be within the range of his expertise."  The Court excluded the witness because he did no measurement of skid marks, he made no measurement of the road grade, nor any particularly computations; and he did not know if the brakes were set on the McDorman car or if it was in gear when it was struck.  He did not know the weight of the vehicles, **and that his estimate of speed would be based on the resulting damages to the vehicles.**" *Id. 356.* Here the court excluded the auto reconstructionist **based on the fact that he never inspected the vehicles in**

1    question to determine whether there was frame damage.

2         A similar result is found in *Gordon v Hurdado*, 541 P.2d 533 (Nev. 1975), the testimony of

3    the expert, Arnold Siegal, was allowed in the district court case, but the Supreme Court reversed

4    holding "the trial court erred when it allowed Arnold W. Siegal, a traffic reconstruction analyst, to

5    testify as an expert, that the point of **impact was the only direct evidence from the records**

6    **which was used by Siegal to arrive at his calculations, which the court found were based**

7    **on assumption, speculation and conjecture having no support in the record**".

8

9         In the instant case, Merala's Report at p. 5, **Vehicle Damage:**

10        **"Photographs and a repair estimate for the Ford F 150 pickup were reviewed."**

11   Merala proceeds to discuss what the **photos showed**.  Mr. Merala does not say that he

12   actually measured the vehicle crush, his report does not say that he measured the angles and

13   configuration of vehicle-to-vehicle contact, because he never saw the vehicles, nor does his list of

14   documents provided include any photos of the Schork Honda or the Margarit Ford 250 pickup

15   truck.  In fact, in 2010 or early 2011, Merala drew a diagram of what he thought was the impact

16   angles, (Ex. 3, (b), (d) and (e), which were attached to Merala's Deposition, Ex. 7.  These diagrams

17   were not part of his **December 5, 2008** Report.  Significantly, it is clear from the property

18   damages to all three vehicles, that the diagram is faulty and inaccurate, but as supported by

19   Merala's deposition testimony, his diagrams are merely guesswork in an effort to provide support

20   for his Report, resulting in a deposition and report based on assumption, speculation and

21   conjecture.

22

23        Furthermore, Merala never even addressed or rendered an opinion of the damage done to

24   the other two vehicles when rendering his opinion and diagrams about their accident contact

25   angles, and their speed, and impact delta V, where all he did was **exclusively, review photos of**

26   **Mr. Young's Ford F 150 pickup**!  So, query, how can he even diagram the contact angles

27   between the three vehicles competently when he never saw any of the three subject vehicles?  In

28

addition to failing to reference the other two vehicles' property damage, Merala Report, Ex. 1 @

p. 5, Merala dedicates10 lines **describing the Young vehicle damage**, and then provided photos

of an "**exemplar**" **model pickup** with a measuring device, and conducted a photo simulation of a

seated driver.  (See Ex. 10, last photo, Bates DEF 03502).  This is an attempt to demonstrate that

the seat belt would have restrained the driver from hitting his head on the steering wheel or

windshield.  The result is an incompetent expert opinion, because, the photo is not of Young's

truck, we don't know what seat configuration existed at the time of the accident, we don't know

the size, age, height, and weight of the exemplar driver, and there is no indicia of any competence

of the ostensible conclusions drawn by Merala in his December 5, 2008 Report (Ex. 1), that:

> 1. __The Delta-V of the Young vehicle during the first collision was likely 5 mph or__ **likely**
>    **less;**
> 2. **The Delta-V of the young vehicle during the second collision, the collision with**
>    **the Ford F 250 pickup, was likely 12-15 mph or less;**
> 1. **Neither collision is likely to cause a significant brain injury to a driver of a Ford**
>    **F 150 pickup;**
> 2. **These biomechanical findings are consistent with the findings report by Dr.**
>    **Robert Asarnow;**
> 3. **Mr. Young appears to have been inappropriately utilizing a designated turn**
>    **lane as a through lane.  This action is a significant factor in the sequence of**
>    **events that resulted in the subject accident; and**
> 4. **That Mr. Young appears to have been travelling at a speed that was**
>    **inappropriate for the conditions present.**

Then Merala's second Report of June 29, 2009, his only additional opinion is "[i]t is my

opinion that Mr. Young is more than 50% responsible for this incident, and but for his actions,

this accident would not have occurred." (Ex. 2)  Merala failed to give his "opinions to a reasonable

degree of certainty in the field of engineering and auto reconstruction"**, either in his reports or**

**in his Deposition Testimony.**  Bottom line, Merala's "Analysis of Accident", Ex. 1, pp 5,

through 8, specifically his conclusions about Delta-V, vehicle speeds, vehicle angles, are pure

speculation and conjecture, and the conclusions are not based on "scientific knowledge", and he

cannot testify that the findings are derived by scientific method, and that his opinions as an expert

are based on scientifically valid principles.

1    Merala's next section, **Analysis of Accident Ex. 1, p**. 5, mid-page:

2        An analysis was performed to determine the speed change (delta-v) of the Young vehicle.
3        The delta-V is the speed change a vehicle experiences in a collision. This change of speed
         can result in a slowing down of the vehicle (as in a frontal collision) or a speeding up (as in
4        a rear-end collision). In a collision without significant intrusion into the occupant space,
         the direction and speed at which an occupant moves within the vehicle is largely
5        determined by the delta-V. When available, it is useful to consider experimental test
         results within analyzing collisions of this kind.
6

7    This analysis is solely, exclusively and wholly a Biomechanical Opinion of whether injury

8    could occur in the speed change that Young's F 150 Ford Pickup sustained. On page 6, Merala

9    stated: **"[t]his description is based solely on materials provided to date**. In furtherance of

10   this conclusion is found in exhibit 10, last photo, where an individual is seated in the "exemplar

11   vehicle" with a seat belt restraint on, and depicting a forward head extension, ostensibly to show

12   that David could not have hit his head on the dash or the front window. This photo is

13

14   incompetent and unscientific evidence which will build appealable error into the record if shown

15   to the jury and relied upon at the time of trial.

16       On p. 6 of Ex. 1, Merala's Report, next section: **Medical Records Review.**

17       Merala then details Mr. Young's **medical history from April 13, 2006 through Dr.**

18   **Ansirinia's medical care and reports in 2007 and 2008,** and concludes that the CT Scans of the

19   **Brain done on April 19, 2006, and September 14, 2006, indicate that there was "no evidence**

20   **for acute injury".** Merala Report, Ex.1, p. 7. Merala then concludes with the section:

21

22       **Injury Analysis:** Review of the medical records indicates that no objective evidence of a
         brain injury was found during examinations of Mr. Young after his accident of April 13,
23       2006. Results of the crash tests conducted with Ford F 150 trucks at severities greater
         than the subject accident have been reviewed. In many of these crash tests instrumented
24       and ropomorphic test devices (crash test dummies) occupied the driver's seat of the
         crashed vehicle.
25

26   At p. 8, of Ex. 1, Merala concluded:

27   1.   The delta-V of the Young vehicle during the first collision, the collision with the 2003
          Honda Accord, was likely 5 mph or less.
28   2.   The delta-V of the Young vehicle during the second collision, the collision with the
          1992 Ford F 250 pickup, was likely 12-15 mph or less.

3. Neither collision is likely to cause significant brain injury to a driver of a Ford F 150 Pickup.
4. These biomechanical findings are consistent with the findings report by Dr. Robert F. Asarnow.
5. Mr. Young appear to have inappropriately utilizing a designated turn lane as a through lane. This action is a significant factor in the sequence of events that resulted in the subject accident.
6. Mr. Young appears to have been travelling at a speed that was inappropriate for the conditions present.

**At no time does Merala apportion liability in this report**. Significantly, on January 20, 2011, Ray Merala had his deposition taken, and he never testified that he had actually seen any of the three vehicles. He then testified that he had seen the depositions of Officer Cunningham, Christopher Schork and Thomas Margarit, **none of which was provided to him before he prepared his 12/05/08 and 05/29/29 reports**.[5] His deposition testimony made it seem as though Merala had relied on these document, depositions, etc. at the original time he prepared his reports, which of course, the timing shows that he did not.

### G.     If Merala Is Allowed To Testify, What is the Impact On the Jury?

The next question the court considered in *Hallmark v Eldridge*, 189 P.3d 646, 654, 655, (Nev. 2008), was whether the error compelled reversal, and whether the admission of the evidence based upon whether the error substantially affected the rights of the appellant. **The test is "whether 'but for that testimony', a different result might have reasonably have been expected."** Accordingly, the Hallmark court reversed the district Court's finding and judgment as to the damage award and remanded the case to the District Court for a new trial limited to the issue of Hallmark's damages. This court should not allow Merala to testify at all during the Jury trial in this case to prevent prejudice to the Plaintiff and creating reversible error.

---

[5] This is true because Officer Cunningham's deposition was taken September 8, 2010. Schork and Margarit's depositions were also taken in 2010, such that Merala could not have relied on them for his Dec. 5, 2008 and June 29, 2009 Reports.

## CONCLUSION

Mercury defends their bad decision not to pay their insured, David Young, $250,000[6] for his contractual right of Underinsured benefits, based in-part, on the Biomechanical Engineer's Report, Ex. 1, and Supplemental Report, (Ex. "2") and anticipated testimony at trial. The timing and manner in which the Merala Report and the Supplemental Report are manifest with unredeemable conduct, vitiating any meritorious defense.

Setting that aside, their reliance on his report and anticipated testimony is misplaced. First, even if Mr. Merala can be qualified as an expert under NRS 50.275, and F.R.C.P. 702, the court must further analyze whether the expected testimony will assist the trier of fact and whether it is relevant and the product of reliable methodology. Because Mercury hired Merala to determine whether this accident caused this closed head injury, Merala should not be qualified as an expert in biomechanical engineering; secondly, even if this court is able to qualify Merala, his opinions cannot **assist the trier of fact in understanding the evidence** or determining a fact is issue based on his skill, experience, training, or education. FRE 702 requires that an expert may testify in the form of an opinion or otherwise if,

1. (a) the **expert's scientific, technical or other specialized knowledge will assist the trier of fact** to understand the evidence or to determine a fact in issue."
2. (b) the testimony is based on sufficient facts or data;
3. (c) **the testimony is the product of reliable principles and methods**, and
4. (d) the **expert has reliably applied the principles and methods** to the facts of the case. F.R.E.702.

Under the authority provided, Young argues that Merala's opinions are not the product of reliable principles and methods, and that he cannot reliably apply the opinions to make the conclusions as contained in his report, particularly as to the speed of the vehicles, the angles of impact, the Delta-V change in velocity to conclude the biomechanical stressor on the human body because he never saw the vehicles to measure crush or speed, or whether there was frame

1  damage, largely because Merala never inspected the vehicles, and as such, Merala should be

2  excluded  from testifying at the time of trial.

3  DATED this 8th Day of October, 2015.

4

5                                                    _____/bij/_____
                                                     Barbara I. Johnston, Esq.

6                                                    8309 Shad Bush Avenue
                                                     Las Vegas, NV. 89149

7                                                    (702) 684-6163
                                                     Attorney for Plaintiff, David Young

8

9

10                              **CERTIFICATE OF SERVICE**

11  1.     On the 8 th day of October, 2015, the undersigned served the following document(s):

12         a.     PLAINTIFF'S  MOTION  IN  LIMINE  #1:  TO  EXCLUDE  MERCURY'S

13                BIOMECHANICAL ENGINEER RAY MERALA FROM TESTIFYING AT TRIAL.

14  2.     I served the above-named document(s) by the following means to the persons as listed below:

15         ☑ a.   **ECF System** to:

16  Benjamin J. Carman, Esq.                   Barbara I. Johnston, Esq.
    Hager Dowling                              Johnston & Associates
17  4045 Spencer Street                        8309 Shad Bush Avenue
    Las Vegas, Nevada 89119                    Las Vegas, NV 89149
18  Telephone: (702) 586-4800                  Telephone:  (702) 684-6163
    Facsimile: (702) 586-0831                  Facsimile:  (702) 541-6743
19  Email: bcarman@hdlaw.com                   Email: barbara.johnston@rockermail.com
    **Attorneys for Defendant, Mercury**       *Attorney for Plaintiff, David Young*
20  **Casualty Company**

21  Matthew Callister, Esq.
    Callister & Associates
22  823 Las Vegas Blvd. So., #330
    Las Vegas, NV  89101
23  Email: MQC@call-law.com
    *Attorney for Plaintiff, David Young*
24

25

26                                                    /s/ Barbara I. Johnston, Esq.

27

28

                                         -32-

**DECLARATION OF BARBARA I. JOHNSTON, ESQ.**

I, Barbara I. Johnston, Esq., declare under penalties of perjury in the state of Nevada that the following documents are true and exact copies of the originals:

1. That I am an attorney, licensed to practice in the State of Nevada at all Federal and State Courts, as well as at the 9th Circuit.

2. That I have prepared a Motion to Exclude Mercury's Expert, Ray Merala, and that the following documents are attached as Exhibits to said Motion.

3. That Ex. 1 is a true and exact copy of Ray Merala's Report dated December 5, 2008.

4. That Ex. 2 is a true and exact copy of Ray Merala's second Report, dated May 29, 2009.

5. That Ex. 3 is a true and exact copy of exhibit 3 (a through k), which are the Exhibits from Ray Merala's Deposition taken on January 20, 2011.

6. That Ex. 4 is a true and exact copy of the Defendant's Expert Disclosure of Ray Merala and his Reports, sans any exhibits.

7. That Ex 5 is a true and exact copy of State Court Case A539366 Binding Arbitration Decision dated January 27, 2011.

8. That Ex 6 is a true and exact copy of Talas Engineering CV of Raymond Merala.

9. That Ex 7 is a true and exact Certified Copy of the Mini-script of Raymond Merala's Deposition.

10. That Ex 8 is a true and exact copy of a Certified Copy of excerpts from Christopher Schork's deposition.

11. That Ex 9 is a true and exact copy of Mercury's Claims Diary, MCF000046-000054;

12. That Ex 10 is a true and exact copy of Talas Engineering Inspection Cover Sheet, of photos of "exemplar" F 150 Ford Pickup Truck, DEF 03438; 03439; 03442; 03443; 03440; 03441; 03441; 03444.

13. That Ex 11 is a true and exact copy of Talas Engineering, Inc. Bill dated 06/12/09, MCF 000191.

14. That Ex 12 is a true and exact copy of Mercury Claims Diary, MCF000040-000042.

15. That Ex 13 is a true and exact copy of Young's F 150 Ford Pickup Truck damages.

-1-

**16.** That Ex 14 is a true and exact copy of Glenn A. Paternoster's Letter dated April 26, 2006 letter to Don Walden, Claims Adjuster, letter with Mercury's Total Loss Evaluation attached.

**17.** That Ex 15 is a true and exact copy of Certified Copies of p. 1 of Depositions, offered to show the dates of the depositions, Ex. 15 (a) page 1 and 2, of  LVMPD Officer Guy A. Cunningham's Deposition; 15 (b) page 1 of Thomas Martin Margarit's Deposition; and 15 (c) p. 1 of Christopher Schork's Deposition.,

Signed under penalty of Perjury of the laws of the State of Nevada.

Dated this 7th day of October, 2015.

Barbara I. Johnston, Esq.